**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

**David Miller,**

**Plaintiff,**

**-vs-**

**Secretary of the U.S. Department of Transportation,**

**Defendant.**

**Case No. 1:23-cv-02315**

**JUDGE PAMELA A. BARKER**

**MEMORANDUM OPINION & ORDER**

Currently pending before the Court is Defendant Sean Duffy, Secretary of the U.S. Department of Transportation's ("Defendant") Motion for Summary Judgment ("Motion"). (Doc. No. 48.) Plaintiff David Miller ("Plaintiff" or "Miller") filed a Memorandum in Opposition to the Motion ("Opposition"), and Defendant filed a Reply in Support of the Motion ("Reply") (Doc. Nos. 52, 55.) For the reasons set forth below the Motion is granted in part and denied in part.

## I. Background

In November 2008, Plaintiff and his then-wife, Carly Miller, began their employment with the Federal Aviation Administration ("FAA") at the Cleveland Air Route Traffic Control Center ("Cleveland Center") as air traffic controllers.[1] (Dep. Tr. of David Miller (Doc. No. 37-1) (hereinafter "Miller Dep."), p. 9). In 2024 and based upon diagnoses of depression and Post Traumatic Stress Disorder, Miller applied for and was granted medical disability by the FAA. (Miller Dep. at p. 278.) Prior to applying for and being granted disability and specifically on December 4, 2023, Plaintiff initiated the instant lawsuit setting forth the following three claims for relief under Title VII of the

[1] Their marriage was not legal due to a "filing error." (Dep. Tr. of David Miller (Doc. No. 37-1), pgs. 28-29.).

Civil Rights Act of 1964 based upon incidents he alleges occurred during his employment with the FAA: Sexual Harassment/Hostile Work Environment; Disparate Treatment; and Retaliation. (Doc. No. 1.)[2] The Court will set forth the facts included in the record relative to each of the incidents that form the bases for Miller's claims that the FAA violated his Title VII civil rights.

The Cleveland Center is divided into eight "areas," and each area monitors flights in a different geographical air space. (Miller Dep., p. 17; Dep. Tr. of Michael Sands (Doc. No. 42-1) (hereinafter "Sands Dep."), pgs. 59-60.) Each area staffs around forty-eight (48) to fifty (50) people, (Sands Dep., p. 18.) Those in "D-side or associate positions" help "the radar control" by performing "behind-the-scenes stuff, calling other facilities, helping out with *** computer functions and whatnot." (Sands Dep., p. 74; Miller Dep., pgs. 139-40.) Within each area, there are six to seven radar positions. (Sands Dep., p. 18, 74; Miller Dep., p. 17.) Individuals in radar positions are tasked with talking to the airplanes. (*Id*., p. 13; Sands Dep., p. 74). Their seats are organized in a U-shape with three controllers seated at "scopes" that face the walls on either side. (Miller Dep., at p. 17.) An area supervisor, also known as a front-line manager, sits between these sets of controllers. (*Id*; Dep. Tr. of Aric Alston, (Doc. No. 43-1) (hereinafter "Alston Dep."), p. 17). Operations managers are in charge of the front-line managers. (Dep. Tr. of Matthew Vogel (Doc. No. 41-1) (hereinafter "Vogel Dep."), pgs. 10-11.) They sit down the hall and work with the area supervisors to oversee the controllers. (*Id*.) The "Air Traffic Manager" oversees the operations in the entire building. (Doc. No. 48-2, PageID# 2708) (full organizational chart).

When Plaintiff and Carly Miller began working at the Cleveland Center, Plaintiff was assigned to Area 1 and Carly was assigned to Area 2. (Miller Dep., pgs. 11, 19.) During his time in

[2] On May 1, 2025, Plaintiff filed an Amended Complaint that included the same three claims for relief but included additional allegations. (Doc. No. 28.)

Area 1, Miller was promoted to the radar class and served in that role as an Air Traffic Control Specialist from 2010 onward. (*Id.*, pgs. 13-14.) Overseeing air traffic from cities like Muskegon and Flint, Area 1 was slower than other areas and was thus more often a source of personnel issues compared to the busier areas. (*Id.*, p. 51; Sands Dep., p. 60).

**A. 2016-2020: Miller's Allegations of Harassment**

Miller is a bi-sexual man, but the parties dispute whether Miller's co-workers were aware of his sexual orientation. (Miller Dep., p. 31.) Defendant asserts that Miller's co-workers were unaware of his sexual orientation because he was married to a woman, Carly Miller, until 2019 and because Miller was rumored to be having an extramarital affair with fellow Area 1 controller, Brandelle Betras. (Sands Dep., pgs. 33-34.) Miller testified that he began to experience a sexual identity crisis around 2019 and although he did not tell any of his co-workers or supervisors about his sexual orientation, over the years there had been "rumors running rampant." (Miller Dep., pgs. 29-33.)

According to Miller, he experienced harassment as early as 2016 when, as Defendant acknowledges, rumors spread that he and his wife were swingers. (Sands Dep., pgs. 34-35; Miller Dep., p. 94.) Miller stated that in 2016, fellow Area 1 controller, Russell Moody, made jokes about the couple being swingers and Miller liking men. (*Id.*, pgs. 35, 94.) Miller testified that in 2016, he received a package at his home that was "a cylinder tube with the words, 'big ass dildos' and 'platinum member' on the outside of the package." (*Id.*, p. 34.) "The outside of the package also depicted multiple sex toys," and enclosed inside, was Plaintiff's water bottle, which he only kept at work. (*Id.*, pgs. 33-34.) Miller testified that he reported the incident to his supervisor at the time, Brendt Sundermeier, but was told that not much could be done since the package was sent to his home. (*Id.*, pgs. 92-93.)

In 2016, another so-called "prank" was reported by Ken Irwin who also was working in Area 1 as a controller. He reported receiving prank calls and a package in the mail with an empty water bottle at his home. (Doc. No. 48-2, PageID# 2514.) Similar to what management had advised Miller when he reported receiving the package at his home as described above, Operations Manager, Jeffrey Kudlo, told Irwin to contact local authorities because the incident occurred off-site. (*Id.*)

According to Miller, in 2019, his supervisor,[3] Aric Alston, made a remark that Miller was working overtime to pay for his wife's abortion and made other remarks about Plaintiff's sexual orientation. (Miller Dep., p. 37.) Alston denies making this remark. (Alston Dep., p. 23.). According to Miller, his wife, Carly, reported the comment to management, but he did not remember the outcome of the investigation. (Miller Dep., p. 46.) In 2019, Plaintiff separated from his wife, with Miller explaining that the pair had been "growing apart." (*Id.,* p. 29.)

Plaintiff testified that in July 2020, someone at the office hung up an image of Fred Flintstone and Barney Rubble engaging in oral sex and superimposed over Barney Rubble were the initials "EZ," which were Plaintiff's operating initials. (*Id*., p. 38.) Miller testified that he reported the incident to management, but it was not investigated. (*Id*., p. 47.) Defendant questions whether the incident occurred because no witnesses have corroborated his story. (Doc. No. 48-1, PageID# 1657.)

[3] Alston was a supervisor in Area 2, which was directly across the hall from Area 1. (Alston Dep., p. 17.) Then sometime around 2019 or 2020, as a result of staff shortages, the Cleveland Center began implementing cross aisle supervision, where Alston and other supervisors, had to "fill in" and supervise in other areas. (*Id.*)

Miller also testified that sometime in 2020, Alston spread a rumor that he had sexual intercourse with fellow Area 1 controller, Ryan Svegel. (Miller Dep., pgs. 128, 166, 181-182, 187.) He stated that he did not report the rumor because it was being spread by Alston. (*Id*., p. 48.)[4]

**B. March 2020-February 2021: Disciplinary Actions Against Miller**

**1. Letter of Reprimand for Inappropriate Conduct**

On March 20, 2020, it was reported that when talking to Betras, Miller remarked, "Hitler and (Jim) Gomoka (Operations Manager) in a room and a gun with 2 bullets, I'd shoot Gomoka in the face twice." (Doc. No. 48-2, PageID# 2060.) It was reported that Betras replied, "'I hope he gets the coronavirus and dies" to which Miller apparently responded, "Oh and AIDS." (*Id*.) Miller testified that this statement was intended to be a joke made in reference to Season 6, Episode 25 of the Office, where the protagonist, Michael Scott states, "If I had a gun with two bullets, and I was in a room with Hitler, bin-Laden, and Toby, I would shoot Toby twice." (Miller Dep. at p. 27); THE OFFICE: *The Chump*, at 01:09-01:16, (Peacock, accessed July 23, 2026.) As a result, on April 20, 2020, Plaintiff received a Letter of Reprimand for inappropriate conduct. (Doc. No. 48-2, PageID# 2062.) On May 6, 2020, Miller issued an apology to Gomoka. (*Id.*, PageID# 2064).

**2. Unauthorized Early Departure**

On September 30, 2020, Miller received a Notice of Proposed 10-Day Suspension based on his unauthorized early departure on February 1, 2020. (Doc. No. 48-2, PageID# 2072.) On February 1, 2020, Miller signed off at 18:25 for what was expected to be a forty-five (45) minute break and left the facility. (*Id*., PageID# 2078.) At 18:45, Betras reset the departure time for Miller to indicate

---

[4] Miller also claims that in the Fall of 2020, multiple items were stolen from his headset drawer, "including gum, sunglasses, nice pens and an amount of cash" and that he reported the issue to his union representative, but no resolution was reached. (Miller Dep., p. 39; Doc. No. 48-2, PageID# 1878.)

that his break began at 18:45 and not 18:25. (*Id.*, PageID# 2077.) However, Miller never returned to the facility that day even though his shift was not set to end until 19:50. (*Id.*)

According to Miller, it was standard practice in Area 1 before COVID-19 for controllers to take longer breaks, particularly if returning meant that "they would only sit for a relatively short session before getting right back out because it was their go-home time." (Doc. No. 48-2, PageID# 2083.) And according to Miller, controllers could ask for permission to leave the facility during their breaks. (Miller Dep., p. 157.)

That evening, Matt Patterson was the Area 1 supervisor, and Brendt Sundermeir was the supervisor in Area 2. (Doc. No. 48-2, PageID# 2078.) Patterson did not recall Plaintiff requesting permission to leave that night. (Doc. No. 48-2, PageID# 2565.) Plaintiff testified that he asked Sundermeir to leave because the Area 1 supervisor was not at the desk. (Doc. No. 48-2, PageID# 2764). Sundermeier was not interviewed during the investigation, but on October 16, 2020, he stated that he could "think of no instance that Mr. Miller left the immediate facility grounds on his break without asking [him] first, and always returned on time." (Doc. No. 48-2, PageID# 2769.) One month later, on November 17, 2020, the proposed suspension was dismissed "based on new information received." (*Id.*, PageID# 2072.)

On December 17, 2020, Operations Manager Matthew Vogel emailed fellow Operations Manager, Todd Wargo, about an employee dispute in Area 1. Vogel wrote, "Graig Zaremba, - [h]e told me that Dave Miller was upset at the Area schedule[] and said something like he would file an EEO or Hostile work environment complaint for the way the schedule was made." (Doc. No. 48-2, PageID# 2518.) Miller testified that he did not tell Mr. Zaremba that he would threaten to file an EEO or hostile work environment complaint for the way the schedule was made. (Miller Dep., p.

169.) On December 31, 2020, Michael Sands, Operations Manager, responded to an email exchange from Wargo and Vogel about the scheduling issue. Sands wrote, in relevant part that:

> As a reminder, I was on Annual Leave and in conjunction with RDOs, I was out of the facility from 14-23 December. When I returned, I was informed that there was an issue in Area 1 and it was in my email. I was also informed that I was now given the file for David Miller on an earlier incident, in which a proposed 10 day suspension had been thrown out, but that I was still expected to issue some sort of other discipline but Michelle Mester (whom I'd need to consult), would be out of office until after the holidays.

(Doc. No. 48-2, PageID# 2516; Sands Dep., p. 10.)

On January 20, 2021, Miller received a renewed Notice of Proposed 10-Day Suspension based on the February 1, 2020 unauthorized early departure incident. (Doc. No. 48-2, PageID# 2077.) On February 13, 2021, Plaintiff received notice that he would be subject only to a five-day suspension for his unauthorized early departure, mitigating the proposed penalty by five days. (*Id.*, PageID# 2777.)

### C. April 2021-December 2021: Betras's EEO Proceeding, Investigation into Alston's Hotline Complaint, Disciplinary Issues, and Additional Allegations of Harassment

#### 1. Miller Participates in EEO Investigation and Defendant Investigates Miller

Brandelle Betras brought an EEO Complaint against several of her supervisors: Aric Alston, Jim Gomoka, and Mike Janes, alleging sexual harassment and discrimination on account of her sex, and on April 1, 2021, Miller signed an affidavit on her behalf. (Doc. No. 48-2, PageID#s 2091-95.) On April 20, 2021, Alston filed a complaint with the administrator's hotline about Miller's "aggressive or aggravated behavior towards management and his co-workers."[5] (Doc. No. 48-2, PageID#s 2727-30.) Alston made more than a dozen claims against Miller for behavior dating back

[5] The hotline also allows personnel to submit issues anonymously. *See, e.g.* (Doc. No. 48-2, PageID# 2733.)

to 2017. (*Id.*) Alston filed another hotline complaint on July 21, 2021, raising additional behavioral concerns, and during those months, he sent management several emails expressing concern over Miller's behavior. (*Id.*, PageID#s 2587-88; 2800-01, 2520.) Alston alleged that Miller (1) vandalized a co-worker's vehicle; (2) called Myles Kerr names, intimidated him, and made fun of his mother; (3) made inappropriate jokes about Josh Wolfe's mother; (4) kicked a trash can at George Netty; (5) threatened and swore at Judd Wallace; (6) threatened to shoot Jim Gomoka in the face; (7) had issues with Mike Janes; (8) falsely accused his supervisor, Sarah Richardson, of sleeping with a controller;[6] (9) engaged in a heated exchange with Mike Hanlon; (10) dumped trash in the dumpsters at work; (11) was caught on camera having sexual relations with Brandelle Betras at work; (12) whispered something to wife that made her cry; (13) brought $140,000 worth of single dollar bills to the office and carried them around his entire shift; and (14) swore at Vince Pignatiello. (*Id.*, PageID#s 2520, 2789-92, 2800-01.) Defendant investigated Alston's claims against Miller as well as those raised by co-workers in the sworn statements, interviews, and emails collected during the course of the investigation. (Doc. No. 48-2, PageID#s 2570-74.) On December 3, 2021, Defendant issued a report detailing the findings from its investigation (the "Report"). (*Id.*)

Some of Alston's claims had already been resolved. Alston alleged that on March 2, 2017, Miller knocked the passenger side mirror of then Area 1 controller, Kevin Fischer's car and failed to report it. (*Id.*, PageID# 2576.) The Report revealed that Miller paid to fix the mirror, management did get involved, and both Alston and Fischer considered the matter closed. (*Id.*, PageID# 2571.) Alston alleged that Miller once stated, "I will shoot Gomoka in the face." (*Id.*, PageID# 2790.) Defendant had already reprimanded Miller a year prior for stating "Hitler and [Gomoka] in a room

[6] Richardson admitted to the relationship and was subject to a suspension. (Doc. No. 48-2, PageID#s 2719-20.)

and a gun with 2 bullets, I'd shoot Gomoka in the face twice." (*Id*., PageID# 2060.) Yet, on May 5, 2021, Operations Manager James Gomoka emailed Thomas Layton, general manager for the Cleveland District, expressing his concern over Miller's behavior and accusing Miller and Betras of "using the EEO process like a weapon." (*Id*., PageID#s 2577, 2521; Dep. Tr. of Thomas Layton (Doc. No. 44-1) (hereinafter "Layton Dep"), p. 5.) In his sworn statement, Gomoka revealed that he decided that he would retire three years earlier than he had planned out of fear of Miller. (Doc. No. 48-2, PageID#s 2652-53.) So, although Defendant had already reprimanded Plaintiff a year prior for stating that, "Hitler and [Gomoka] in a room and a gun with 2 bullets, I'd shoot Gomoka in the face twice," Defendant included Gomoka's renewed safety concerns in its Report. (*Id*., PageID#s 2572; 2060.))

One claim raised in the statements of a coworker taken during the investigation occurred so long ago that Defendant declined to investigate it. Mark Violand accused Miller of stealing his power cord sometime around 2015. (*Id*., PageID# 2572.) Miller testified that he did not recall that the power cord was stolen. (Miller Dep., p. 53.) Sands declined to pursue the matter since the incident occurred six years before the investigation. (Doc. No. 48-2, PageID# 2531.)

Miller and Defendant dispute the veracity of certain allegations contained in the Report. Alston claimed that Miller made inappropriate jokes about supervisor Josh Wolfe's mother, and put a paper strip disrespecting Wolfe's mother in his headset drawer. (*Id*., PageID# 2728.) Plaintiff disputes that he ever wrote a comment about Wolfe's mother and placed it in his drawer. Plaintiff does admit that he made "your Mom" jokes to Wolfe but noted that Wolfe made the same jokes at his expense. (*Id*.) As to Area 1 controller George Nettey's accusation that in late 2019 Miller, once in anger, kicked a trash can at him, Miller admits that did once get angry with Nettey for taking too

long on his break but denies that he kicked a trash can at him. (*Id.*, PageID# 2572; Miller Dep., p. 138.) Rather, Miller testified that the trash can "just got knocked over as [he] walked out going to bathroom." (Miller Dep., p. 138.)

As to controller Judd Wallace's accusation that in December 2019, Miller once screamed profanity at him, Miller admits that he did raise his voice at Wallace but denies that he threatened him or used expletives. (Miller Dep., p. 145.) Miller testified that he was only reacting to Wallace's inappropriate comments about Carly Miller's sex life. (Miller Dep., p. 145) ("I did have words with Judd, like I said earlier, but it was more along the lines of don't talk about my wife.") As to controller Graig Zaremba's accusation that sometime in 2018 or 2019, Miller rolled his chair into him and struck him, Miller denies the accusations. (Doc. No. 48-2, PageID# 2620.) As to controller Mike Hanlon's claim that in late 2020 or early 2021, Miller screamed profanity at him, Miller admits that he and Hanlon had a verbal dispute but denies using profanity. (*Id.*, PageID#s 2655, 2620.) Miller noted that the dispute only arose because Hanlon said, "[d]o you want me to tell those dumbasses how to do their fucking job?" (*Id.*, PageID# 2620.) Hanlon admitted that he was the one who suggested taking the dispute outside. (*Id.*, PageID# 2655.) Hanlon and Miller both recall exchanging apologies afterward. (*Id.*, PageID#s 2655, 2620.)

In September 2021, Miller changed his operating initials from "EZ" to "CU." (*Id.*, PageID# 1710, 2678; Miller Dep., p. 238.) Defendant maintains this switch was so that his initials could be displayed next to Ryan Svegel's operating initials, which were "NT," so management made Miller switch back to "EZ." (Doc. No. 48-2, PageID# 1710, 2678.) Plaintiff asserts that he originally wanted to switch his operating initials because his co-workers made jokes like "EZ in bed" or "EZ at the gay club." (Miller Dep., p. 237-39.) Furthermore, Miller testified that when his operating initials were

"CU," they never appeared above Svegel's "NT." (*Id.*) In his deposition as well as the sworn statement he signed in response to the proposed allegations, Miller disputed the veracity of many of the allegations made by his co-workers, but there were some claims that Miller failed to address. *See* (Miller Dep.; Doc. No. 48-2, PageID#s 2617-2622.)

Miller did not specifically dispute the following claims. First, Miller did not address Defendant's assertion that sometime around 2018 he once told Nettey to "shut up." (Doc. No. 48-2, PageID# 2365.) Second, Miller did not address Nettey's claim that shortly after the 2019 trash can incident, he once overheard Miller tell controller Brian Guzik, "I hope you drive into a ditch and die." (*Id.*, PageID# 2635.) Third, Miller did not respond to Mike Janes' allegation that sometime in 2019, Miller once called him an "asshole" and would say things like "fuck your mom" or "you're a fucking idiot." (*Id.*, PageID#s 2620, 2843.) Fourth, Miller also did not address Front Line Manager Gary Porta's allegation that sometime around 2020, Miller yelled profanity at him in response to Porta's request that he put his phone away. (*Id.*, PageID# 2635.) Miller did not respond to Noah Pelkowski's allegation that on September 24, 2021, Miller slammed down his keyboard and water bottle in frustration when he thought Pelkowski was sitting too near to him given the ongoing pandemic. (*Id.*, PageID# 2668-69.)

Miller points out that many of the allegations that his co-workers raised against him were not addressed in the Report. (Doc. No. 52, PageID# 2967.) For example, Alston alleged that Plaintiff brought $140,000 in singles and carried that sum around his entire shift. (*Id.*, PageID# 2520.) Miller denies this accusation, and in his Opposition, points out that such a sum of money would have weighed over three hundred pounds. (Miller Dep., p. 193; Doc. No. 52, PageID# 2964.) Alston also

alleged that Miller and Betras were caught on camera having sexual relations at work, but Defendant did not address this claim in the Report. (Doc. No. 48-2, PageID# 2729.)

Alston also claimed that on the day Myles Kerr's mom took a tour of the Cleveland Center, Miller said to his fellow controller, "I will fuck your mom." (*Id.*, PageID#s 2527-28.) Alston alleged that on another occasion, Miller blocked Kerr from exiting the facility. (*Id.*, PageID#s 2527-28.) Plaintiff denies doing anything to harass Kerr and notes that at that point, guests had not been allowed to tour the facility since before the pandemic. (Miller Dep., p. 200; Doc. No. 48-2, PageID# 2618.) More notably, Kerr did not remember either incident taking place. (Dep. Tr. of Myles Kerr (Doc. No. 20) (hereinafter "Kerr Dep."), pgs. 20-21.)

Sometime during the investigation, controller Jeff Tilley accused Miller of stealing NATCA sweatshirts and practicing lock picking. (Doc. No. 48-2, PageID#s 2532, 2683-84.) Email exchanges between those in management revealed that these accusations could not be substantiated. (*Id.*, PageID# 2531.) In the months before the Report was released, Defendant discussed the need to review security footage as to Kyle McHugh's report that he saw Miller walking around a bulldozer in a closed off parking lot area. (*Id.*, PageID# 3030.) The investigation did not mention this accusation or whether Defendant reviewed any such security footage. As Miller points out, the Report demonstrates that several of the accusations that his co-workers raised against him were never substantiated.

**2. Disciplinary Issues and Additional Allegations of Harassment**

While the investigation was ongoing, the following three incidents, for which Miller would later be disciplined, took place. First, Miller was accused of swearing on a recorded line. On July 3, 2021, Betras was working traffic in Area 1 and gave the following "relief briefing"[7] to Miller:

> Betras: Alright, welcome to the [inaudible].
> Miller: Great.
> Betras: Where it's still a shit show.
> Miller: I don't want to be here.
> Betras: An effing shit show.
> Miller: A chicken shit operation.
> Betras: You got it. . . .

(Audio, 0:05-0:12). Miller testified that Andy Behary, Operations Manager, was the one who had first used the phrase "chicken shit operation" earlier that day. (Miller Dep., p. 207.) He explained that Area 1 experienced "high stress" that day because President Joe Biden was flying into Traverse City, Michigan. (Miller Dep., pgs. 205-06.)

Second, Miller was accused of inappropriate conduct for swearing at controller Vincent Pignatiello. On July 15, 2021, Pignatiello criticized Miller for taking too long a break. (Doc. No. 48-2, PageID# 2529; Miller Dep. at p. 212.) Pignatiello did not curse at him. (*Id*., pgs. 211-12.) Yet when Pignatiello turned around, Miller said, "[w]hat the fuck are you looking at?" (*Id*., p. 208.) Pignatiello replied, "[w]hat did you say to me." (*Id*.) Miller again said, "[w]hat the fuck are you looking at?" The next day, Pignatiello observed that Miller was typing "aggressively" on his keyboard and "began to crack a pencil that was at the sector in a manner that felt threatening and was also very uncomfortable." (Doc. No. 48-2, PageID# 2028.) Miller denies that he was aggressively typing on his keyboard and testified that there were no pencils in Area 1 as they only used pens. (Miller Dep., pgs. 216-17.)

---

[7] Defendant conventionally filed an audio recording of this exchange with this Court. (Doc. No. 49) ("Audio")

Third, Miller was accused of exhibiting a sleep-like state while on duty on August 2, 2021. The parties dispute whether Miller fell asleep. Zaremba and Alston contend that they saw Miller sleeping. Zaremba maintains that he witnessed Miller asleep for fifteen minutes. (Doc. No. 48-2, PageID# 2695.) Alston testified that Miller appeared to be asleep for three to four minutes. (Alston Dep., p. 45.) Alston said, "I tapped Mr. Miller on the shoulder and says, 'Were you asleep?' And his response was, 'No. I wasn't asleep. I was just resting my eyes thinking about my sign-in on CRU-ART.'" (*Id.*) Miller denies that he fell asleep on that date. He admits that he was leaning back in his chair and had his feet up but denies that he fell asleep during his shift. (Miller Dep., p. 231.) Miller also asserts that he requested the audio recordings from that evening, so that he could use them as evidence that he was not fatigued and answered all the lines, but Defendant never gave these to him. (Doc. No. 48-2, PageID# 2000.)

Less than a week later, Miller reported multiple incidents of harassment. Miller testified that on August 8, 2021, someone put homosexual pornography in his drawer. (Miller Dep. at p. 233.) Miller immediately informed his supervisor, Noah Pelkowski, and together, they alerted Sands. (Miller Dep., p. 233.) Miller admits he told Pelkowski that he did not wish to make a big deal out of the situation. (Miller Dep. at p. 234.) On August 12, 2021, Miller again found pornography in his drawer and reported it to Sands. (Miller Dep., p. 241-42.) Sands reported the incident, but no perpetrator was ever identified. (Sands Dep., p. 120; Miller Dep., pgs. 66-67.)

Miller also testified that on August 16, 2021, a cylindrical package from "Big Ass Dildos" containing a pink vibrator was left in his home mailbox with no return address. (*Id.*, pgs. 243-44.) Miller stated that about a week later, sometime around August 23, 2021, he found a big inflatable male blow up doll in his mailbox at home. (*Id.*, PageID# 1663; Miller Dep., p. 244.) Shortly

thereafter, Miller reported finding another graphic photograph in his desk at work that included his operating initials and "FAA." (*Id.*, p. 4.) The person who distributed these materials was never identified. (*Id.*; Miller Dep., p. 245; Doc. No. 48-2, PageID# 2986.) Miller reported the incident, but that investigation did not yield any results "as there were no further logical leads." (Doc. No. 48-2, PageID# 1948.) These incidents occurred during Defendant's investigation into complaints about Miller.

**D. 2022: Notice of Proposed Removal and Additional Allegations of Harassment**

On January 14, 2022, Michael Sands issued a notice of proposed removal for inappropriate conduct and exhibiting a sleep-like state while on duty against Miller for the swearing on a recorded line, cursing at Pignatiello, and exhibiting a sleep-like state while on duty. (*Id.*, PageID# 2295.) Sands stated that "most of these things never should have rose *** to the level of the operations manager. But somehow, they always seemed to rise to the operations manager and above when they involved Dave Miller." (Sands Dep. at p. 50.) He also testified that he thought they were "overreaching" when they issued a Notice of Proposed Removal against Miller. (*Id.*, p. 84.) On that same date, Miller was reassigned to desk duty. (*Id.*, p. 257.) Defendant maintains that Thomas Layton "took [Miller] out of the operation because he was facing a proposed removal and there was conflict within the area in which he had been working." (*Id.* (citing Doc. No. 48-2, PageID# 1733.) Miller testified that as part of this assignment, he was "told to report to the front office" and was not given any work "for seven months until they determined the 45-day suspension." (Miller Dep. at p. 257.)

On February 22, 2022, Thomas Layton, signed a Notice of his Decision to cancel the Proposed Notice of Removal. (Doc. No. 48-2, PageID# 2301.) On March 9, 2022, Dale McNeal, General Manager, Indianapolis District, issued a renewed Proposed Notice of Removal. (*Id.*, PageID# 2303.)

On March 18, 2022, Plaintiff received a letter with a death threat and graphic pornographic image at his home address. (Miller Dep., pgs. 40-41).

> Hey you fucking faggot you better hope and fucking pray you don't find yourself back in area 1 or we might have ourselves an old fashion fag drag. You fucking piece of gay shit, it makes us sick to see you coming in stinking of cum breath after giving Ryan a blowjob in the stall, day dreaming about trying to take James Moon's 12-inch cock up for your fat hairy stink hole. No wonder Carly ditched your tub of shit gay ass, no one can stand your queer looks. The only reason why you even banged her she kind of looks like a fat dude, you fool no one. You know why your father killed himself in Lake Erie? He could [not] stand having a queer fudge packer as a son. Below is a photo that represents your current situation faggot. I think it's funny you can come in thinking now that we have a queer DOT Secretary, you're safe??? No one wants your queer bait around, not us and not management. Just remember you set your nasty fucking foot in area 1 and your cum rag face will be dead.

(Doc. No. 52, PageID# 2985.) Miller testified that he reported the incident to management and to the Lorain County Sheriff's Office. (Miller Dep., pgs. 47-48, 68.) The police closed the case due to a lack of evidence and witnesses after their only lead, Joshua Edgett, did not answer their phone call. (Doc. No. 48-2, PageID#s 1970-71.) Edgett did eventually return the call but said he did not have any information. (*Id.*) At the same time, Defendant began to investigate the incident but soon stopped, citing the lack of leads in the police investigation. (*Id.*, PageID# 1962.) Plaintiff stated that in May 2022, his vehicle was vandalized off-site with graphic images and he reported the incident to Layton. (Miller Dep. at pgs. 41, 45; Doc. No. 28, ¶ 262.)

On July 14, 2022, McNeal mitigated the proposed penalty and instead issued a forty-five (45) day suspension. (Doc. No. 48-2, PageID# 2353.)[8] Miller returned from his suspension on August 29, 2022, and was re-assigned to Area 6. (*Id.*, PageID# 2556; Miller Dep., pgs. 232, 250.)

Plaintiff testified that in August 2022, his vehicle was vandalized with garbage, but he did not report this incident to management. (*Id.*, pgs. 45, 48.) In September 2022, Miller claims that co-workers again defaced his personal space at work with homophobic slurs and graphic homosexual pornography and informed Layton that his lawyer would be filing an EEO complaint, which he did shortly thereafter. (Miller Dep. p. 39; Doc. No. 48-2, PageID#s 2556-57.) Miller reported several incidents of harassment throughout this period.

**E. 2023-2024: Anonymous Complaints and Miller's Retirement**

In 2023 and 2024, several anonymous hotline complaints were filed against Miller. On April 12, 2023, an anonymous complainant claimed Miller showed pornography to those at the Cleveland Center. (*Id.*, PageID# 2694.) On April 20, 2023, Thomas Layton requested that Miller's work computer be analyzed to see if there was any evidence that he authored the "frivolous anonymous Hotline Complaints." (Doc. No. 52, PageID# 3110.) Layton testified that he did not believe this investigation uncovered any evidence which would point to Miller as the source of these complaints. (Layton Dep., p. 51.) On October 6, 2023, an anonymous complainant accused Miller of masturbating while on duty. (Doc. No. 48-2, PageID# 1712.) Then, on January 3, 2024, an anonymous complainant accused Miller of "shoving [complainant] into the wall tr[ying] to force

[8] According to Michael Sands, penalties are usually mitigated from what is initially proposed. (Doc. No. 52, PageID#s 2954-55) (citing (Sands Dep., p. 66)) ("[A]lmost all of our disciplinary actions get – get mitigated to a lower. It's almost always the case. It's very rarely that we say, 'Let's – let's recommend five-day suspension,' and the person gets a five-day suspension.")

himself upon [complainant] sexually. [Miller] has his penis in his hands and told me to squeal piggy." (*Id*., PageID# 1714.)

By summer's end, Miller had applied for and received medical disability since he could no longer perform his job due to Post Traumatic Stress Disorder.[9] (Doc. No. 52, PageID# 2946) (citing (Miller Dep., p. 278)); Doc. No. 48-2, PageID# 1680.) Miller's last day of work was August 5, 2024. (Doc. No. 48-2, PageID# 1680.) When Miller packed his things to leave, he discovered a butt plug and more photos in his locker. (Miller Dep., p. 284-85.) Miller was earning a salary of $188,992 at the time and has been collecting a disability annuity since his last day. (*Id*.)

## II. Procedural History

On December 4, 2023, Plaintiff filed a Complaint setting forth the following three causes of action pursuant to Title VII of the Civil Rights Act of 1964 against Defendant: sexual harassment/hostile work environment; disparate treatment; and retaliation. (Doc. No. 1.) On April 2, 2024, Defendant filed an Answer to the Complaint. (Doc. No. 12.) On February 19, 2025, Plaintiff filed a Motion for Leave to File an Amended Complaint and after the Motion was fully briefed, this Court granted it on May 1, 2025. (Doc. Nos. 21, 23, 24, 27.) That same day, Plaintiff filed his First Amended Complaint, setting forth the same three causes of action, but including additional allegations. (Doc. No. 28.) On May 7, 2025, Defendant filed its Answer to the Amended Complaint. (Doc. No. 30.)

On September 25, 2025, Defendant filed the Motion. (Doc. No. 48.) On November 17, Plaintiff filed his Opposition, and on December 12, 2025, Defendant filed the Reply. (Doc. Nos. 52, 55.) Accordingly, the Motion is ripe for review.

---

[9] Plaintiff was also suffering from major depressive disorder. (Miller Dep., PageID# 692.)

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch*., 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc*., 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc*., 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp*., 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."

*Ask Chems.*, 593 F. App'x at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV. Analysis

### A. First Cause of Action: Sexual Harassment/Hostile Work Environment

In Plaintiff's First Cause of Action, Plaintiff alleges that "Defendant harassed and subjected him to a hostile work environment based on his sex and sexual orientation" by fostering a hostile work environment. (Doc. No. 28, PageID# 264, ¶¶ 55-63.) In the Motion, Defendant first argues that Plaintiff fails to establish a prima facie case for hostile work environment. (Doc. No. 48-1, PageID#s 1668, 1670-71.) In support, Defendant argues that Plaintiff fails to show that Miller's claims were based on sexual orientation because (1) there is no evidence that Plaintiff's fellow controllers or his supervisors knew that he was bi-sexual; (2) other employees at the Cleveland Center were subjected to similar antics;[10] and (3) if Miller was targeted by his colleagues, it was because he was disliked. (*Id.*, PageID# 1668.) Second, Defendant asserts that Plaintiff has not shown the conduct to be so severe and pervasive as to create a hostile work environment. (*Id.*, PageID#s 1670-71.) Third, Defendant maintains that Plaintiff lacks a basis to impute liability onto Defendant because supervisors responded to any issues Miller raised and it cannot be held liable for anonymous conduct. (*Id.*, PageID# 1671.)

[10] The only other "antic" that Defendant cites to as harassment that occurred to someone other than Miller was the situation where Ken Irwin received prank calls and a package in the mail with an empty water bottle at his home. (Doc. No. 48-2, PageID# 2514.) However, this one other "antic" did not involve the use of slurs or the distribution of graphic materials.

Plaintiff makes several arguments in opposition. First, he argues that the conduct was based on his sex or sexual orientation. (Doc. No. 52, PageID# 2951.) In support, Plaintiff contends that law in the Sixth Circuit permits a plaintiff to point to direct evidence of the use of specific conduct and derogatory terms directed at a protected class to support a claim for harassment. (*Id.*) (citing *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375 (6th Cir. 2025)). Second, Plaintiff maintains that the conduct was severe and persuasive and urges the Court to include off-site incidents as part of its analysis. (*Id.*, PageID#s 2955-59.) Third, Plaintiff asserts that he need not show that Defendant knew of the harassment since it was perpetrated by his supervisor. (*Id.*, PageID#s 2959-61.) Plaintiff also casts doubt on whether Defendant conducted a good faith investigation into his claims. (*Id.*) In the Reply, Defendant reiterates his arguments set forth in his Motion but adds that he should not be held liable for incidents that either took place off-site, went unreported, or were reported, but were the subject of a good faith investigation. (Doc. No. 55, PageID# 264, ¶¶ 55-63.) This Court will address these arguments in turn below.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile work environment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986). This type of discrimination occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (punctuation modified). Title VII "affords employees the right to work in an

environment free from discriminatory intimidation, ridicule, and insult and thus prohibits conduct which is sufficiently severe and pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 765 (6th Cir. 2008).

To establish a hostile work environment claim, a plaintiff must show that: "(i) [h]e was a member of a protected class; (ii) [h]e was subjected to unwelcome harassment; (iii) the harassment was based on sex; (iv) the harassment unreasonably interfered with h[is] work performance by creating an environment that was intimidating, hostile, or offensive; and (v) there is a basis for employer liability." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (citing *Williams v. General Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999)). For the sake of the Motion, Defendant does not contest that Plaintiff was bisexual and thus a member of a protected class. (Doc. No. 48-1, PageID# 1668.) Rather, the parties' dispute centers around whether the alleged harassment was *based* on his sexual orientation, whether the harassment was sufficiently severe or pervasive as to create a hostile work environment, and whether Plaintiff has a basis to impute liability onto Defendant. (Doc. No. 48-1, PageID#s 1668, 1670-71.)

**1. Based on Plaintiff's Sex and Sexual Orientation.**

This Court rejects Defendant's argument that Plaintiff could not show harassment was based on his sexual orientation because his co-workers or supervisors did not know his sexual orientation. First, the parties agree that there were rumors that Plaintiff and his wife were swingers. Miller testified that Russell Moody used to make jokes about the couple being swingers and Miller liking men. Second, the case that Defendant references in support of this assertion can be distinguished from this case. (Doc. No. 48-1, PageID# 1668) (citing *Lovelace v. BP Prods. N. Am.*, 252 F. App'x

33, 40-41 (6th Cir. 2007) (subjective belief incidents were racially motivated insufficient). In *Lovelace*, the Sixth Circuit held that the allegations that plaintiffs' manager "gave them the cold shoulder, [a co-worker] called [one of the plaintiffs] a 'stupid bitch,' and [that co-worker] disparaged disabled people, do not have a direct bearing on the central claim of racial animus." 252 F. App'x at 41. The harassment here amounted to more than "a cold shoulder." Miller reported that on least five occasions an anonymous harasser or harassers had defaced his work area with homophobic slurs and pornography on multiple occasions, with his operating initials often displayed on the images. Given the rumors swirling about Plaintiff's private life as well the overtly sexual nature of the incidents, there is a genuine issue of material fact as to whether the alleged harassment was because of Plaintiff's sexual orientation and the jury must decide this issue.

**2. Severe and Pervasive**

This Court rejects Defendant's argument that Miller cannot show that the conduct was severe or pervasive so as to foster a hostile work environment. For alleged harassment to be actionable, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). "To determine whether an environment is sufficiently hostile or abusive, a court must consider 'all of the circumstances,' including the 'frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Lindsey*, 295 F. App'x at 766 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The harassment "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (cleaned up).

The Court will begin by discussing whether the conduct was objectively severe and pervasive. Even if this Court were to exclude all incidents that went unreported and all incidents that occurred off-premises,[11] genuine issues preclude this Court from deciding whether Plaintiff was subjected to harassment that was so severe and pervasive such that a reasonable person would find it hostile or abusive. For example, the parties dispute whether Alston made a remark that Miller was working overtime to pay for his wife's abortion and whether he made other remarks about Plaintiff's sexual orientation. Miller also testified that sometime in 2020, Alston had spread a rumor that he had sexual intercourse with fellow Area 1 controller, Ryan Svegel. [12] He also testified that Russell Moody, made jokes about Miller and his wife being swingers and Miller liking men.[13] Genuine disputes of material fact exist as to how Plaintiff's co-workers discussed his sex and sexual orientation.

More significantly, genuine disputes of fact exist as to whether Miller's workspace and area were defaced with homophobic slurs and pornography of which he was the subject. The parties dispute whether in July 2020, someone at the office had hung up an image of Fred Flintstone and

---

[11] To impute liability onto Defendant, Plaintiff must show that Defendant knew of or should have known about the harassment. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 887 (6th Cir. 2008).

Furthermore, the Sixth Circuit "has not decided whether off-premises harassment by a coworker may be considered as part of the severe or pervasive test under Title VII's sexual harassment provisions." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008) (citing *Duggins v. Steak 'N Shake, Inc.,* 3 F. App'x. 302, 311 (6th Cir. 2001) (noting that although the Sixth Circuit has not directly addressed the issue of off-premises harassment by an employee, "other courts have held that generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from the workplace setting").

[12] He stated that he did not report the rumor because it was being spread by his direct supervisor. (Miller Dep., p. 48); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) ("[E]mployers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment.").

[13] It is undisputed that rumors had spread about Plaintiff and his wife being swingers. (Sands Dep., pgs. 34-35; Miller Dep. at p. 94.)

Barney Rubble engaging in oral sex and superimposed over Barney Rubble were the initials "EZ," which were Plaintiff's operating initials. Miller also testified that someone had put homosexual pornography in his drawer on August 8, 2021 and again on August 12, 2021.[14] Shortly after that incident, Miller reported finding another graphic photograph in his desk at work that included his operating initials and "FAA." Likewise, Miller claims that in September 2022, co-workers again defaced his personal space at work with homophobic slurs and graphic homosexual pornography. Genuine disputes of material fact exist as whether Plaintiff received these unwelcome images and writings.

Miller was also the subject of several sexually charged anonymous hotline complaints. On April 12, 2023, an anonymous complainant claimed Miller showed pornography to those at the Cleveland Center. On October 6, 2023, an anonymous complainant accused Miller of masturbating while on duty. Then, on January 3, 2024, an anonymous complainant accused Miller of "shoving [complainant] into the wall tr[ying] to force himself upon [complainant] sexually. [Miller] ha[d] his penis in his hands and told me to squeal piggy." (Doc. No. 48-2, PageID# 1714.) Thomas Layton referred to these complaints as "frivolous" and even once requested that Miller's work computer be analyzed to see if there was any evidence that he authored them himself, an inquiry which yielded nothing. (Layton Dep., p. 51.) Genuine disputes of material fact exist as to whether these complaints were filed by Miller's colleagues or by Miller himself.

The Court will next examine whether Miller would have subjectively found this environment abusive or hostile and concludes that Defendant's argument that Plaintiff lacked a subjective belief that the environment was abusive because he himself participated in identical conduct fails. First,

[14] In the Motion, Defendant maintains that it is possible that Miller planted these materials himself. (Doc. No. 48-1, PageID# 1663.)

Defendant fails to cite to any legal authority in support of its view that Plaintiff's participation in identical conduct would invalidate the subjective prong of this analysis. Second, even if it had referenced such authority, Defendant's argument still fails because it hinges on disputed facts. Defendant argues that Plaintiff participated in identical conduct because he had showed pornography at work and called his coworkers inappropriate names like "pussy," "faggot," and "dickhole," but Plaintiff disputes the veracity of these allegations. Based on the numerosity of the incidents, the explicitly sexual nature of several of the incidents, and the fact that the incidents were targeted specifically to Plaintiff as his operating initials were often included on the graphic images, this Court finds that genuine issues of material fact as to these incidents preclude it from reaching whether the conduct was severe and pervasive.

Lastly, this Court turns to whether Plaintiff has a basis to impute liability on to Defendant and rejects Defendant's argument that it cannot do so. *See* (Doc. No. 48-1, PageID# 1671.) First, Defendant argues that Plaintiff has no basis to impute liability because he cannot rely on anonymous conduct to support a claim for hostile work environment. (*Id.*) However, Defendant fails to reference a case from this Circuit to supports its contention. (*Id.*) Rather, Defendant references only a 2009 district court case from the Middle District of North Carolina involving a retaliation claim in support, which this Court finds unconvincing. (*Id.*) (citing *Caldwell v. Jackson*, 2009 WL 2487850 (M.D.N.C. Aug. 11, 2009), *report and recommendation adopted,* 831 F. Supp. 2d 911 (M.D.N.C. 2010)).

Second, this Court rejects Defendant's assertion that Plaintiff lacks a basis to impute liability because Defendant conducted good faith investigations into any reported incidents. (Doc. No. 48-1, PageID# 1671) (citing *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 887 (6th Cir. 2008)). Plaintiff maintains that despite his consistent reporting, all of Defendant's investigations, if

they happened at all, were inadequate. For example, Defendant did open an investigation into one of the 2021 incidents where Miller found a graphic photograph in his desk, but the investigation was closed "due to a lack of witnesses, there were no further logical leads to follow to identify" the responsible party. (Doc. No. 48-2, PageID# 1948.) The investigation report had three exhibits attached: the request for investigation, the graphic photos that Miller received, and a sworn statement from Miller. (*Id.*) There is no evidence indicating Defendant conducted any interviews or collected any sworn statements from Miller's colleagues as to who they thought may have planted these images. Meanwhile, when Defendant investigated Miller for allegations raised in Alston's hotline complaint, the Report had thirty-one exhibits. (*Id.*, PageID#s 2573-74.) Although this Court acknowledges that Alston's hotline complaint involved multiple allegations as opposed to just one, it finds these distinctions worth noting. Furthermore, as to harassment at the Cleveland Center generally, controller Ryan Svegel remarked "I know they say [harassment] is not tolerated, but it does not seem that way." (Doc. No. 52, PageID# 3000); *see Bailey*, 526 F.3d at 887 ("A harassment policy itself means nothing without enforcement.") This statement offers further support for Plaintiff's argument that Defendant failed to take corrective action based on his complaints. For these reasons, this Court agrees with Plaintiff that genuine issues of material fact exist as to whether Defendant investigated each of his claims and if it did investigate, whether those investigations were conducted in good faith.

Accordingly, the Court concludes that Defendant is not entitled to summary judgment with respect to Plaintiff's Title VII hostile work environment sexual harassment claim.

**B. Second Cause of Action: Disparate Treatment**

In Plaintiff's Second Cause of Action, Plaintiff alleges that "Defendant harassed and subjected him to a hostile work environment based on his sex and sexual orientation" by engaging in

discriminatory actions. (Doc. No. 28, PageID# 265, ¶¶ 64-73.) In the Motion, Defendant argues that Miller cannot prove causation because he cannot show that a similarly situated employee was treated more favorably than him. (Doc. No. 48-1, PageID# 1672.) To support this argument, Defendant asserts that Miller cannot show (1) that any of his co-workers were heterosexual; (2) another employee was similarly situated to him because there was no one else who "created the volume or magnitude of issues that Miller did"; and (3) other employees were treated more leniently for the same conduct. (*Id.*, PageID#s 1672-74.)[15] Defendant also contends that Plaintiff's disparate treatment claim fails because Defendant had legitimate, non-discriminatory reasons to justify its actions. (*Id.*, PageID#s 1674-75.) In the Opposition, Plaintiff does not directly reference his claim for disparate treatment. (Doc. No. 52.)[16] Thus, in the Reply, Defendant reiterates that Plaintiff failed to identify a similarly situated individual and that it had legitimate non-discriminatory reasons for its actions. (Doc. No. 55, PageID#s 3128-30.) This Court will address these arguments below.

An employee may rely on either direct or circumstantial evidence to establish that an employer engaged in discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). "'[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id.* at 865 (quoting *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "Consistent with this definition, direct evidence does not require a factfinder to draw any inferences in order to conclude

---

[15] The Court rejects this third argument. As Plaintiff points out in the Opposition, this argument is contradicted by Michael Sands, who explained that penalties were usually mitigated from what was initially proposed. (Doc. No. 52, PageID#s 2954-55) (citing (Sands Dep., p. 66)).

[16] This Court notes that in the Amended Complaint, Plaintiff's First and Second Causes of Action are identical, with Plaintiff invoking the elements for a hostile work environment claim when alleging his disparate treatment claim. *Compare* (Doc. No. 28, ¶¶ 55-63; *with id.*, ¶¶ 64-73.) To distinguish them, Plaintiff merely adds the sentence, "Defendant engaged in discriminatory actions because of his sex and sexual orientation" to his disparate treatment claim. (*Id.*, ¶ 69.) This Court reminds Plaintiff that hostile work environment and disparate treatment are not the same causes of action.

that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* Without direct evidence, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Kroger*, 319 F.3d at 865-66.

Since Plaintiff fails to respond to Defendant's arguments as to this cause of action, it would be within this Court's power to dismiss his disparate treatment claim and deem it abandoned. *See Hicks v. Concorde Career Coll.*, 449 F. App'x. 484, 487 (6th Cir. 2011) (finding that "[t]he district court properly declined to consider the merits of [plaintiff's] claim because [plaintiff] failed to address it in ... his response to the summary judgment motion.") Even so, this Court will address this cause of action on the merits.

To do so, the Court must first discern under what theory Plaintiff brings his disparate treatment claim. Plaintiff does use the phrase "direct evidence" in the Opposition. (Doc. No. 52, PageID# 2953.) Plaintiff refers to "the use of homosexual slurs like 'faggot,' 'fag drag,' calling him a 'fucking piece of gay shit,' a 'fudge packer,' 'queer bait,' and a 'cum rag face'" as "direct evidence of discriminatory animus underlying any other reason for an alleged dislike of Mr. Miller." (*Id.*) This Court does not take this statement to mean that Plaintiff intended to invoke the direct evidence theory of disparate treatment, but assuming arguendo that he did, this Court finds that these statements do not constitute direct evidence of discrimination. These remarks were excerpted from the anonymous death threat that was mailed to Plaintiff's house. The letter does not include a reference to potential adverse employment actions. *See Erwin v. Potter*, 79 F. App'x 893, 896-97 (6th Cir. 2003) ("Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds.") Thus, since a factfinder would have to draw an inference to connect the

purported discriminatory animus to the adverse employment actions, this Court will analyze Plaintiff's disparate treatment claim under the *McDonnell Douglas* framework.[17]

Under this framework, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination." *Kroger*, 319 F.3d at 866. To establish a prima facie case of discrimination, a plaintiff must "show that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000). "The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Kroger*, 319 F.3d at 866 (quoting *Univ. of Cincinnati*, 215 F.3d at 573). Finally, "[i]f the defendant is able to satisfy this burden, the plaintiff must then 'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.*

The Court concludes that Miller's disparate treatment claims fail because he cannot establish the fourth prong of his prima facie case, that a similarly situated, female or heterosexual employee, was treated more favorably than Miller. To satisfy the fourth element of a prima facie case of discrimination, Miller "must point to a person outside the protected class who received more favorable treatment." *Arnold v. City of Columbus*, 515 F. App'x 524, 532 (6th Cir. 2013). In other

[17] Mixed motive theory can be applied in cases "where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989)). "A plaintiff triggers mixed-motive analysis by giving notice of bringing such claims." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642 (6th Cir. 2012) (citing *Spees v. James Marine, Inc.,* 617 F.3d 380, 390 (6th Cir. 2010)). Since no such notice has been given here, this Court need not analyze Plaintiff's disparate treatment claim under this theory.

words, Miller must identify a female or heterosexual employee whose job performance was similar to Miller's but whose employment was not subject to the same disciplinary actions or re-assignments. Miller fails to identify any such comparator. This is fatal to Miller's disparate treatment claims. *See Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (concluding that the plaintiff failed to establish a prima facie case of race discrimination under Title VII because he "offered no proof that a similarly situated non-protected employee was treated differently"). Accordingly, the Court concludes that Miller cannot establish a prima facie case of sex or sexual orientation discrimination, and thus, his disparate treatment claim fails as a matter of law.

Accordingly, the Court concludes that Defendant is entitled to summary judgment with respect to Plaintiff's Title VII disparate treatment claim.

**C. Third Cause of Action: Retaliation**

In Plaintiff's Third Cause of Action, Plaintiff alleges that "Defendant engaged in retaliatory treatment against Plaintiff for his protected EEO activity including participation in a co-worker's EEO complaint and his own EEO activity." (Doc. No. 28, PageID# 266, ¶¶ 74-77.) In the Motion, Defendant argues that Plaintiff fails to show that his protected activity was the but-for cause of the adverse employment acts and that Plaintiff "cannot prove retaliation when alleged acts were performed by anonymous individuals." (Doc. No. 48-1, PageID#s 1668-77.) In the Opposition, Plaintiff maintains that temporal proximity alone is sufficient to establish causation but even so, he argues that he has more than just temporal proximity supports his claim. (Doc. No. 52, PageID#s 2962-72.) In its Reply, Defendant argues that (1) "some of the alleged retaliation occurred before the protected activity"; (2) "much of the alleged retaliation after the protected activity does not amount to adverse action"; and (3) it "had legitimate, non-discriminatory reasons for all adverse action." (Doc. No. 55) (alteration as in original). The Court will address these arguments in turn.

As with disparate treatment claims, in the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002). To establish a prima facie case of unlawful retaliation under Title VII, a plaintiff must demonstrate by a preponderance of the evidence that: (1) he engaged in activity that Title VII protects; (2) defendant knew that he engaged in this protected activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Kappen v. Ashley Medical Supply, Inc.*, 695 F. App'x. 94, 96 (6th Cir. 2017). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen,* 229 F.3d at 563; *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (stating that establishing a prima facie case entails a lower burden of proof than what is required to win a judgment on the merits).

**1. Prima Facie Case**

This Court will first address Defendant's argument that Plaintiff has failed to establish a prima facie case for retaliation under Title VII because he failed to show that Miller's participation in protected activity caused the adverse employment actions.

In the retaliation context, a causal connection between an employer's actions and a protected activity is established when the protected activity was the "but-for" cause of the alleged adverse action by the employer. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "But-for" causation means that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*; *see also Lisan v. Wilkie*, 835 F. App'x 831, 835 (6th Cir. 2020); *Seoane-Vazquez v. Ohio State Univ.*, 577 F.

App'x 418, 428 (6th Cir. 2014). Whether a protected activity was the but-for cause of an employee's termination is a context-specific inquiry. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007)).

First, this Court rejects Defendant's argument that Plaintiff has not established causation because "the Employment Actions were all legitimate penalties for Miller's workplace infractions." (Doc. No. 48-1, PageID# 1675.) Defendant cites two Sixth Circuit cases to support this point, which this Court will examine below. *See* (*id.*, PageID#s 1675-76) (citing *EEOC v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015); *Gribcheck v. Runyon*, 245 F.3d 547 (6th Cir. 2001)). First, the Sixth Circuit's decision in *Ford Motor Company* is inapposite to the instant action. The plaintiff in that case brought a retaliation claim under the Americans with Disabilities Act. *Ford Motor Co.,* 782 F.3d at 770. Likewise, the Sixth Circuit's decision *Gribcheck* can be distinguished from this case because it involves a retaliation claim brought under the Rehabilitation Act and there, the Sixth Circuit held, contrary to what Defendant argues, that plaintiff satisfied the causation element of his prima facie case. 245 F.3d 547, 551. Thus, Defendant fails to support its assertion that Plaintiff has not established causation.[18]

Second, the Court rejects Defendant's argument that Plaintiff failed to establish causation because "managers administered all of the Employment Actions before Miller filed his EEO claims." (Doc. No. 48-1, PageID# 1676.) Although Miller did not file his own EEO Complaint until November 2022, he engaged in protected activity on April 1, 2021 when he signed an affidavit on behalf of Betras in support of her EEO filing. *See* (Doc. No. 48-2, PageID# 1684.) This participation

[18] In the Motion, Defendant fails to argue that it had a legitimate, non-discriminatory reason for disciplining and re-assigning Miller and frames its argument only in terms of Miller's failure to establish a prima facie case of retaliation.

occurred well over a year before Plaintiff was subjected to a forty-five (45) day suspension and later re-assigned.

Third, this Court rejects Defendant's argument that "temporal proximity, alone, cannot establish the necessary causation in a retaliation case." This Court acknowledges that whether temporal proximity in the retaliation context can, on its own, demonstrate causation, has at times been unclear in the Sixth Circuit. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–25 (6th Cir. 2008) (collecting cases). The Sixth Circuit has held that "temporal proximity between the employee's engagement in protected conduct and the adverse employment action also plays a role in the causation analysis, though the circuit's case law is inconsistent on whether temporal proximity standing alone is sufficient to establish causation." *Green v. Cent. Ohio Transit Auth.*, 647 F. App'x 555, 560 (6th Cir. 2016).

For temporal proximity to ever be sufficient by itself, the adverse employment action must take place close in time after an employer learns of the protected activity. *See Wade v. City of Toledo*, 2020 WL 1140075, at *11 (N.D. Ohio Mar. 9, 2020) ("Temporal proximity may in some circumstances be 'enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation', but only when 'an adverse employment action occurs very close in time after an employer learns of a protected activity.'") (quoting *Mickey*, 516 F.3d at 525; *Jackson v. Baxter Int'l, Inc.*, 2007 WL 4510258, at *4 (N.D. Ohio Dec. 18, 2007) ("[T]he Sixth Circuit has consistently determined temporal proximity beyond three months, absent some further indicia of retaliation was insufficient to infer causation."). This Court agrees with Plaintiff that temporal proximity can establish a causal connection. *See also* (Doc. No. 52, PageID# 2963) (citing *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d

274, 283-84 (6th Cir. 2012) (collecting cases holding that a two to three-month time lapse is sufficient temporal proximity to satisfy a plaintiff's prima facie case of retaliation)).

Here, Miller signed the affidavit for Betras's EEO proceeding on April 1, 2021, and on April 20, 2021, Alston filed a complaint with the administrator's hotline about Miller's "aggressive or aggravated behavior towards management on his co-workers." This complaint sparked an almost yearlong investigation into Miller, wherein Defendant collected a dozen sworn statements and conducted several interviews with employees about Miller's behavior at the Cleveland Center. The existence of temporal proximity certainly cuts in favor of Plaintiff, but Plaintiff offers more than just temporal proximity to support his claim because, as he points out, many of the accusations brought against him were unsubstantiated.

Many of the allegations raised by Miller's co-workers were unsubstantiated. For example, Alston, who was named in Betras's EEO Complaint, alleged that Plaintiff brought $140,000 in singles and carried that sum around his entire shift. Miller denies this accusation, and in his Opposition, points out that such a sum of money would have weighed over three hundred pounds. (Doc. No. 52, PageID# 2964.) Alston claimed Miller harassed and cornered Myles Kerr. Alston claimed that on the day Kerr's mom took a tour of the Cleveland Center (even though guests had not been allowed to tour the facility since before the pandemic) Miller told him, "I will fuck your mom." Alston also alleged that on another occasion, Miller blocked Kerr from exiting the facility. Kerr did not remember either incident taking place. In addition to these claims, Alston also reported that Miller and Betras were caught on camera having sexual relations at work, but Defendant never corroborated this claim in the Report.

Other employees made similar accusations. Jeff Tilley accused Miller of stealing NATCA sweatshirts and practicing lock picking, but these claims could not be substantiated. Mark Violand accused Miller of stealing his power cord six years prior, but Defendant declined to pursue this outdated accusation. Kyle McHugh reported that he saw Miller walking around a bulldozer in a closed off parking lot. Defendant discussed the need to review security footage, yet the Report did not mention whether Defendant reviewed any such security footage and what, if anything, it revealed. After Plaintiff engaged in protected activity, he was the subject of a multitude of different allegations, many of them unsubstantiated.

Similarly, many issues raised in the investigation, while substantiated, had already been resolved and were now being reexamined. In his complaint, Alston referenced a 2017 incident, where Miller knocked the passenger side mirror of Kevin Fischer's car and failed to report it. The Report revealed that both Alston and Fischer considered the matter resolved. Likewise, a month after Alston made his initial complaint, Gomoka, who was also named in Betras's EEO filing, expressed renewed concerns over Miller's remark about shooting him, even though Plaintiff was disciplined for this conduct a year prior. In fact, most of the incidents that served as the basis for the investigation of Miller took place *years* before Miller's engaged in protected activity and yet many were only reported after Miller engaged in protected activity by signing the Affidavit for Betras's EEO complaint. For these reasons, Plaintiff has come forward with evidence of more than just temporal proximity in support of its allegation that Defendant would not have taken the adverse action but-for the protected activity.

Finally, the Court turns to, and ultimately rejects, Defendant's assertion that since Plaintiff had been disciplined before April 1, 2021, "his EEO testimony cannot be the 'likely reason' Miller

was on supervisors' radar." (Doc. No. 55, PageID# 3131.) The fact that Plaintiff has been disciplined in the past does not affect this Court's ruling. Given the breadth of unsubstantiated, old, and resurrected claims that were brought against Miller in the weeks that followed his protected activity, genuine issues of material fact preclude this Court from granting summary judgment in favor of Defendant as to whether Plaintiff has established a prima facie case for retaliation.

**2. Legitimate, Non-Discriminatory Reason and Pretext**

This Court will next address the assertion, which Defendant raises in the Reply, that it had a legitimate, non-discriminatory reason for disciplining Plaintiff and re-assigning him to a different role. Because Plaintiff can establish a prima facie case of retaliation, the burden shifts to Defendant "to articulate some legitimate, non-discriminatory reason for its actions." *Goodsite*, *v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014). If Defendant satisfies its burden of production, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason was mere pretext. *Id.* This Court ultimately rejects Defendant's assertion.

First, the Court rejects this argument because Defendant only raised it for the first time in its Reply. As this Court has already explained, courts will not normally consider issues raised for the first time in Reply Briefs, as it deprives the non-movant of a full and fair opportunity to respond. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

Second, even assuming arguendo that Defendant had made this argument in its initial Motion, the Court would still find it without merit because genuine issues of material fact would preclude this Court from determining whether Defendant's proffered reasons were pretext. A plaintiff may establish pretext by showing the defendant's reasons: (1) lacked a basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse employment action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). To show pretext,

Plaintiff must show "more than a dispute over the facts upon which the discharge was based." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). "Plaintiff must put forth evidence that Defendants did not 'honestly believe' in the given reason for Plaintiff's termination." *Id*. Plaintiff has put sufficient forth evidence to show that Defendant did not honestly believe that Miller's infractions were the real reason for his punishment. On the topic of Miller's disciplinary infractions, Michael Sands, operations manager, remarked that "most of these things never should have rose *** to the level of the operations manager. But somehow, they always seemed to rise to the operations manager and above when they involved Dave Miller." (Sands Dep., p. 50.) Sands also testified that he thought they were "overreaching" when they issued a Notice of Proposed Removal against Miller. (*Id*., p. 84.) Furthermore, in the same email where area supervisor, James Gomoka, renewed his concern about Miller's year-old threat, Gomoka also accused Miller of "using the EEO process like a weapon." (*Id*., PageID# 2577, 2521). Thus, Defendant is not entitled to summary judgment on this basis.

**3. Retaliation Based on Anonymous Conduct**

This Court will next address, and ultimately reject, Defendant's argument that Plaintiff "cannot prove retaliation when alleged acts were performed by anonymous individuals." Even assuming arguendo that Plaintiff cannot bring a retaliation claim based on anonymous conduct,[19] Plaintiff's protected activity was not based only on his complaints that anonymous harassers defaced his workspace with slurs and planted pornography. Importantly, Plaintiff signed an affidavit

[19] Defendant references three cases to support this proposition, none of which bind this Court. *See* (Doc. No. 48-1, PageID# 1676) (citing *Caldwell v. Jackson*, 2009 WL 2487850 (M.D.N.C. Aug. 11, 2009), *report and recommendation adopted*, 831 F. Supp. 2d 911 (M.D.N.C. 2010); *Williams v. Alkermes*, Inc., 2025 WL 567548, at *4 (E.D. Tenn. Feb. 20, 2025); *Ziskie v. Mineta*, 547 F.3d 220 (4th Cir. 2008)).

supporting Betras in the EEO complaint that she brought against her supervisors, Aric Alston, Jim Gomoka, and Mike Janes, about allegedly discriminatory statements they had made. *See* (Doc. No. 52, PageID#s 3096-99.) So, although Plaintiff did later file EEO complaints based on several anonymous acts, his protected activity was not based only on anonymous conduct.

Accordingly, the Court concludes that Defendant is not entitled to summary judgment with respect to Plaintiff's Title VII retaliation claim.

## V. Conclusion

For the reasons set forth herein, Defendant's Motion for Summary (Doc. No. 48) is granted in part and denied in part as set forth above. This Court denies the Motion as to the First and Third Causes of Action but grants the Motion as to his Second Cause of Action.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
U.S. DISTRICT JUDGE

Date: August 21, 2026